UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CYNTHIA COLEMAN, | ) | CASE NO. 1:16-cv-0179 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY | ) | THOMAS M. PARKER |
| ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |
| | ) | |

## I.      Introduction

Plaintiff, Cynthia Coleman ("Coleman"), seeks judicial review of the final decision of the Commissioner of Social Security denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and  XVI of the Social Security Act ("Act").  This matter is before the court pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3), and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be AFFIRMED.

## II.      Procedural History

Plaintiff applied for a period of disability and disability insurance benefits in March 2012. (Tr. 350, 523-525)  She also filed an application for supplemental security income in October 2013. (Tr. 350)  Ms. Coleman alleged her disability began on December 3, 2011. (Tr. 350)  Ms. Coleman's application was denied initially on June 2, 2012 (Tr.428-438) and after

reconsideration on February 22, 2013. (Tr.440-452)  On March 26, 2013, Ms. Coleman requested an administrative hearing. (Tr.475-476)

A hearing was held before the Administrative Law Judge ("ALJ"), Pamela E. Loesel, on March 26, 2014.  (Tr. 350)  The ALJ issued a decision on May 28, 2014, finding that Ms. Coleman was not disabled.  (Tr. 350-363)  Ms. Coleman requested a review of the hearing decision.  (Tr. 1)  The Appeals Council denied review, rendering the ALJ's May 28, 2014 decision final. (Tr. 1-4)

On January 26, 2016, Ms. Coleman filed an appeal of the ALJ's final decision with this court. (Doc. 1)  Defendant answered and filed the transcript of the administrative proceedings on April 4, 2016. (Docs. 8 and 9)  Coleman filed a brief on the merits on June 12, 2016 (Doc. 12) and Defendant filed her brief on the merits on August 11, 2016 (Doc. 14) making the matter ripe for this court's review.

### III.   Evidence

#### A.   Personal, Educational and Vocational Evidence

Ms. Coleman was born on July 10, 1963 and was 48 years old on the alleged onset date. (Tr. 362)  At the time of the administrative hearing, she was living with her husband and adult son.  She also has an adult daughter and five grandchildren.  (Tr. 377, 381)

#### B.   Medical Evidence

Ms. Coleman has a medical history of having had a cervical fusion surgery at C5-6, cervical disc disease with neck pain and radiculopathy, low back pain with sciatica, bilateral knee pain with early osteoarthritis, diabetes, obesity, hypertension, metabolic syndrome, asthma, and benign paroxysmal vertigo. (Tr. 664-665)  Ms. Coleman previously was determined to be

disabled from March 16, 2001 to August 1, 2003 due to a cervical herniated disc and the aforementioned fusion surgery, and neck and shoulder pain.  (Tr. 415-427)

In September 2011, Ms. Coleman was referred to Dr. Ballou of MetroHealth Medical Center for pain in both knees, aggravated by physical activity particularly by going up and down stairs, and by prolonged standing or sitting. (Tr. 704)  Dr. Ballou's physical examination revealed medial joint space tenderness and mild crepitus on the right. (Tr. 704)  Dr. Ballou believed that Ms. Coleman probably had mild early osteoarthritis of her knees, but possibly had an internal derangement on the right, where her symptoms were worse. (Tr. 705)

On November 2, 2012, Ms. Coleman went to the emergency room feeling dizzy with a headache.  (Tr. 863)  A CT scan of her head showed no evidence of acute intracranial hemorrhage or definite acute cortical infarction.  (Tr. 876)  She was diagnosed with vertigo and a migraine headache. (Tr. 865)  In November 2012, plaintiff's internal medicine physician, Dr. Anita Redahan documented "active left arm symptoms" with a diagnosis of cervical disc disease. (Tr. 904)

A cervical x-ray was taken on November 12, 2012 due to "left sided radiculopathy symptoms." (Tr. 920)  The x-ray showed the prior cervical disc fusion at C5-C6 and disc space narrowing at C4-5 and C6-7. (Tr. 918)

On December 11, 2012, Ms. Coleman presented with another episode of vertigo. (Tr. 891)  Plaintiff reported that she had experienced vertigo and blocked ears for years.  (Tr. 891)  Pure tone testing revealed normal hearing sensitivity, bilaterally with a slight asymmetry.  (Tr. 933)  She was diagnosed with vertigo and acoustic reflex decay of the right ear. (Tr. 893)  Ms. Coleman was advised to follow up with an ENT specialist, including possible further testing to rule out retrocochlear involvement. (Tr. 886)

3

An EMG/NCV test taken on December 19, 2012 was most consistent with left cervical radiculopathy, probably at spinal level C7. (Tr. 1032-1033)

Plaintiff visited Dr.  Redahan on December 21, 2012.  (Tr. 1016)  Dr. Redahan diagnosed diabetes Mellitus, cervical radiculopathy, moderate persistent asthma, and hypertension. (Tr. 1019-1029)  Dr. Redahan requested a consultation for Ms. Coleman's dizziness, but testing could not be performed due to plaintiff's left shoulder pain and limited motion. (Tr. 1012)  In January 2013, Dr. Redahan increased Ms. Coleman's prescription for Lyrica and Tramadol.  (Tr. 1003)

On April 3, 2013, Ms. Coleman was evaluated in MetroHealth's physical medicine and rehabilitation department. (Tr. 972-976)  Physical examination showed increased cervical lordotic curvature, decreased cervical range of motion, tenderness throughout the shoulder girdle bilaterally, tenderness in the left shoulder bicipital groove and subacromial region, 2+ reflexes in both upper extremities with positive Hoffman's bilaterally, decreased sensation in the entire left upper extremity, decreased fine motor coordination in the left upper extremity, and an unsteady gait with heel-toe walking. (Tr. 976) Dr. Khera, the physician who examined plaintiff, noted that plaintiff had radicular pain as well as myofascial pain and questioned whether myelopathy was the cause. (Tr. 976)  An MRI and physical therapy were ordered and Ms. Coleman's dosage of Lyrica was increased. (Tr. 976)  The MRI taken in April 2013 revealed mild degenerative changes; mild to moderate multilevel narrowing of the neural foramina; and no evidence of cord compression or abnormal signal intensity. (Tr. 948-949)

On April 4, 2013, Ms. Coleman reported bilateral heel pain and Dr. Redahan ordered x-rays. (Tr. 969)  She told plaintiff to use a gel heel pad for comfort and told her to do daily foot exercises.  (Tr. 969)  The x-ray showed normal results. (Tr. 961)

4

Plaintiff started physical therapy and using a TENS unit on April 10, 2013.  (Tr. 950-956) She reported aggravated pain when reaching overhead with left arm, turning her head to the left, sitting up and laying on her right side. (Tr. 952)  Ms. Coleman complained of left upper extremity pain and impaired sensation, progressive balance impairment and chronic vertigo and her goal was to decrease her neck and shoulder pain and to be able to read sitting up rather than lying down. (Tr. 953, 955) Notes from the initial evaluation state that Ms. Coleman "is most comfortable laying down" and that she needed to lie down two times during the evaluation. (Tr. 955)  Ten physical therapy sessions were scheduled. (Tr. 941-943, 1125-1127, 1132-1134, 1275-1278, 1284-1286, 1350-1355)

In March 2013, plaintiff complained of 5/10 heel pain, but described her neck, shoulders, and hand" as "doing fine." (Tr. 1125-26)  She reported doing her exercises daily and feeling off balance, but denied any falls. (Tr. 1125)  Plaintiff's physical therapist, Ms. Elizabeth Volpe, recommended a cane at physical therapy on May 1, 2013 when testing revealed that plaintiff was at-risk for falls. (Tr. 1127)  Ms. Coleman stated that she would obtain a cane on her own and she was instructed to bring it to her next therapy session. (Tr. 1127)  None of the subsequent medical records document plaintiff's use of a cane or other assistive device.

On May 3, 2013, plaintiff presented to a podiatrist, Dr. Lisa Roth, complaining of continued bilateral heel pain. (Tr. 1120)  Dr. Roth discussed planter fasciitis with plaintiff in detail. (Tr. 1120)  She also instructed plaintiff to continue with stretching exercises at least twice daily, to use ice, night splints, cortisone injections, casting, mediation, and to obtain over-the-counter rigid inserts. (Tr. 1120)

On May 15, 2013, Ms. Coleman underwent a sleep study due to excessive daytime sleepiness, difficulty falling asleep, gagging/choking at night, difficulty maintaining sleep,

awakening with a headache, snoring and uncontrolled hypertension. (Tr. 1056, 1110) Ms. Coleman was advised to avoid driving or operating dangerous machinery until her sleep symptoms were controlled. (Tr. 1060)  She started using a CPAP machine with a nasal mask. (Tr. 1087, 1280)  She underwent another study in June 2013 which revealed moderate obstructive sleep apnea, controlled with the CPAP device. (Tr. 1056-60) Follow-up testing was recommended to determine whether supplemental oxygen was appropriate. (Tr. 1060)  At a follow-up appointment in September 2013, plaintiff reported that she could not sleep without the CPAP machine and was breathing better with more energy during the day. (Tr. 1499)  A polysomnogram performed on January 30, 2014 confirmed obstructive sleep apnea, morbid obesity, inadequate sleep hygiene, and lack of adequate sleep.  (Tr. 1163)  Follow-up testing in February 2014 showed that plaintiff's sleep apnea responded adequately to bi-level CPAP on room air. (Tr. 1167)  A non-specific early REM latency was identified, which could have been caused by a number of factors. (Tr. 1167)

On June 12, 2013, Ms. Coleman presented for a follow-up appointment related to her moderate persistent asthma, with a dry cough at night. (Tr. 1066)  A spirometry test was normal, except there were findings suggestive of possible small airways disease.  (Tr. 1075)

On December 13, 2013, Ms. Coleman went to the emergency room for increasing left shoulder and left sided neck pain which worsened with sitting up and with standing.  (Tr. 1387)  She was diagnosed with left C8 radiculopathy and discharged.  (Tr. 1390)

Ms. Coleman returned to the physical medicine and rehabilitation department on January 8, 2014 complaining of pain and paresthesia in the left forearm and small finger.  (Tr. 1338)  She met with Dr. Antwon Morton, who diagnosed left cervical radiculopathy status post remote cervical fusion. (Tr. 1338-42, 1552-1559) Dr. Morton reviewed an April 2013 MRI of plaintiff's

cervical spine which did not show myelopathy.  (Tr. 1559)  He reviewed an x-ray of her left shoulder which showed minor arthritic changes. (Tr. 1559)   Dr. Morton referred plaintiff to physical therapy and encouraged weight loss by implementing regular exercise and diet modification.  (Tr. 1559)

Ms. Coleman was seen in pain management on February 7, 2014 for neck, upper back, and left arm pain.  (Tr. 1148, 1155)  The diagnosis for this encounter included the conditions of cervical disc disease, cervical radiculopathy at C7, cervicalgia, asthma, unspecified essential hypertension, diabetes mellitus, and morbid obesity. (Tr. 1155)  Ms. Coleman's medications were adjusted and a TENS unit was prescribed. (Tr. 1155)  Plaintiff received a bilateral C6 and C7 epidural injection on February 19, 2014. (Tr. 1617)

Ms. Coleman returned to pain management on March 7, 2014 reporting that she was gradually improving. (Tr. 1159)  She received a right C6 and C7 cervical epidural injection on March 19, 2014 and was continuing to use her TENS unit for one hour at a time. (Tr. 1552, 1580)

Plaintiff met with Dr. Morton on April 2, 2014 and reported that she was having more frequent muscle spasms in her calves and had recently fallen.  (Tr. 1553-1554) Ms. Coleman had discontinued using Lyrica sometime before her April 2014 appointment with Dr. Morton. (Tr. 1559)  In his impression notes, Dr. Morton states that "patient also has a possible LUE (left upper extremity) Impingement Syndrome." (Tr. 1559)

C.     **New Evidence/Evidence Not Presented to ALJ**

After the ALJ issued a decision, plaintiff continued to treat with Dr. Antwon Morton for her cervical radiculopathy, cervical disc disease and radicular and myofascial pain.  (Tr. 34-41) On June 2, 2014, Dr. Morton noted that an injection in late April helped plaintiff's pain reach

0/10 currently. (Tr. 275) Plaintiff denied numbness in the right thumb region, but stated that numbness returned if she had to hold any objects for more than 10-20 minutes. (Tr. 275) Plaintiff reported an inability to braid hair like she wanted to because of a "funny feeling" in hands. (Tr. 275) She denied dropping objects with her hands, but rarely carried things in her left hand. (Tr. 276)

X-rays were obtained on September 2, 2014 after Ms. Coleman had been complaining of knee pain for over two years. (Tr. 53) The x-rays showed mild degenerative changes of the right and left knees. (Tr. 47)

Physical therapy progress notes from September 2014 state that Ms. Coleman was having pain when changing between sitting and standing, an antalgic gait, decreased stance time, and bilateral lower extremity weakness. (Tr. 110-111) She needed frequent rest breaks during her therapy session. (Tr. 111)

Plaintiff returned to see Dr. Morton again on November 6, 2014. (Tr. 204) Dr. Morton reported that, "since her last visit in June patient reports generally feeling stable." (Tr. 204) Plaintiff also reported low back pain at this appointment. (Tr. 204) She reported that her pain was aggravated by prolonged standing, cold weather and having to bend her knees too far. (Tr. 204) Plaintiff rated her knee pain as 3 out of 10 and her neck pain as 2-3 out of 10. (Tr. 204) Plaintiff denied any hand numbness or tingling. (Tr. 204) Dr. Morton noted that Ms. Coleman had continued weakness in her upper extremities bilaterally and that she had difficulty opening jars and holding objects for a long time. (Tr. 204) Dr. Morton also noted that plaintiff had an unsteady gait which he related to her prior diagnosis of vertigo. (Tr. 205)

Ms. Coleman presented to Dr. Joseph P. Hanna, a neurologist, on November 14, 2014. (Tr. 230-237) Dr. Hanna diagnosed cervical spondylosis with myelopathy. (Tr. 236) He

8

recommended physical therapy. (Tr. 237)  Ms. Coleman presented for physical therapy on November 20, 2014. (Tr. 248)  Notes from that appointment indicate that plaintiff had impaired posture, decreased strength, painful range of motion, decreased flexibility and impaired ability to function secondary to the pain. (Tr. 248)

    **D.**    **Opinion Evidence**

        **1.**    **Treating Physician[1] – Dr. Antwon Morton – October 2014**

On October 7, 2014, after the administrative hearing had taken place, Dr. Morton completed a medical source statement opining that Ms. Coleman was limited to: lifting and carrying 10 pounds maximum; standing/walking and sitting for one hour at a time; up to four to six hours total; occasional reaching, pushing and pulling; with the need to take extra breaks and elevate her legs; and with pain that interferes with concentration, staying on task and attendance (Tr. 16-17) Dr. Morton based his opinion on an EMG from 2012, an MRI from April 2013, and x-rays taken in September 2014. (Tr. 16)  In the medical source statement, Dr. Morton opined that plaintiff could occasionally engage in postural activities except for crawling and could frequently engage in fine and gross manipulation. (Tr. 17)  He stated that she experienced mild and moderate pain that affected her concentration, on-task performance, and absenteeism.  (Tr. 17)  He further opined that she would need to elevate her legs 45 degrees and would require 8 hours of additional, unscheduled rest periods in an 8-hour workday. (Tr. 17)

---

[1] Defendant disputes that Dr. Morton may properly be characterized as a treating source due to the comparatively few occasions on which he saw Coleman.

### 2. State Agency Reviewing Physician - Elizabeth Das – June 2012

Dr. Elizabeth Das, a state agency reviewing physician, reviewed the record in June 2012 and concluded that plaintiff had no exertional limitations. (Tr. 435-436)  She determined that Ms. Coleman had only environmental limitations. (Tr. 435-436)

### 3. Examining Psychologist – Dr. J. Joseph Konieczny, Ph.D. – June 2012

On June 21, 2012, Dr. J. Joseph Konieczny, Ph.D., evaluated Ms. Coleman at the agency's request. (Tr. 852-855)  Dr. Konieczny made no diagnosis of any mental health or psychological condition and found that Ms. Coleman participated in routine daily household responsibilities to the extent she was physically capable.  (Tr. 855)

### 4. State Agency Reviewing Physician – Gerald Klyop – February 2013

State Agency Physician Dr. Gerald Klyop reviewed the record at the reconsideration stage of review and concluded that plaintiff could perform work at the medium exertional level (that she could occasionally lift 50 pounds; frequently lift 25 pounds; sit for about six hours in an eight-hour workday; and stand/walk for the same amount of time.)  (Tr. 448)  Dr. Klyop further opined that plaintiff was limited to occasional bilateral reaching due to her C5-C6 fusion surgery and that she must avoid concentrated exposure to certain environmental conditions such as fumes and extreme cold.  (Tr. 449)

### E.  Testimonial Evidence

#### 1.  Ms. Coleman's Testimony

At the time of the hearing, Ms. Coleman lived with her husband and thirty year-old son. (Tr. 377)  Ms. Coleman testified that she was able to do dishes and cooking. (Tr. 377)  Her

husband did laundry and other household cleaning. (Tr. 377-378)  Ms. Coleman testified that she
was capable of cleaning but that it would take her a long time because she would get tired and
would need to take breaks. (Tr. 388)

Ms. Coleman had stopped driving approximately two years before the hearing and did not
have a current driver's license. (Tr. 378)  She relied on public transportation when she needed to
go somewhere. (Tr. 378)

Ms. Coleman had obtained her GED. (Tr. 379)  She was also working on obtaining an
on-line bachelor's degree in legal studies and business. (Tr. 379)  She was half way through this
program but was taking a leave of absence at the time of the hearing. (Tr. 379-380)

A typical day for Ms. Coleman involved her waking up, going to the bathroom, walking
around, looking at the news and letting her small puppy outside. (Tr. 380)  She would then eat
and help her husband with laundry or watch T.V. with him. (Tr. 380)

Ms. Coleman previously provided daycare for some of her grandchildren. (Tr. 382)  She
had worked in that role until November 2010. (Tr. 382)  She stated that the heaviest things she
had been required to lift in that position were her twin grandchildren who started at
approximately five pounds and grew to 15 pounds before she stopped lifting them. (Tr. 382-383)
She stopped providing daycare when the children entered full-time school and no longer required
her services.  (Tr. 382)

Ms. Coleman also previously worked as a reservation specialist for Marriot International.
(Tr. 383)  That job involved mostly sitting.  (Tr. 383)  She was not required to lift anything
heavy during that employment, which lasted for approximately nine months in 2007.  (Tr. 383-
384)  She left that job because of her asthma and sickness. (Tr. 384)

11

Ms. Coleman had also worked part-time as a unit secretary for Montefiore Home. (Tr. 384) That position involved mostly standing. (Tr. 384) She did not have to do any heavy lifting during that employment. (Tr. 385) She left that job when she obtained other employment. (Tr. 385)

In 1999 and 2000, Ms. Coleman worked for Benjamin Rose Institute as a full-time STNA. (Tr. 385) She was required to lift patients while working at that job. (Tr. 386) She was released from that job, but did not recall the reason that her employment was terminated. (Tr. 386)

Ms. Coleman testified that she had difficulties sitting for extended periods and was only able to sit for thirty minutes to an hour at a time. (Tr. 387) She also had difficulty climbing stairs and would have severe shortness of breath when she did. (Tr. 287) Ms. Coleman needed help putting socks on because she could not lean forward. (Tr. 387) She could not take a bath because she would not be able to get out of the tub. (Tr. 387)

Ms. Coleman testified that, in the past five years, she had gained a lot of weight. (Tr. 388) Her weight had increased from 120 pounds to 266 pounds. (Tr. 388) She believed that medications and sleep apnea had caused her to gain the weight. (Tr. 389)

She was taking medication for high blood pressure, diabetes, pain and cholesterol. (Tr. 389) She was also taking Ultram, Naproxen, Flexeril and Tylenol for pain and arthritis. (Tr. 389) She had previously been taking Lyrica. (Tr. 389)

Ms. Coleman stated that changes in weather, animals, dust and allergies aggravated her asthma. (Tr. 389) Ms. Coleman testified that her dog was a Shih Tzu. (Tr. 389)

Ms. Coleman testified that she had a nagging, aching pain on the left side of her neck that traveled down her arm to her fingers.  (Tr. 390)  She also explained that she had trouble sleeping. (Tr. 390)

### 2.   Vocational Expert's Testimony

A vocational expert ("VE"), Bruce Holderhead, testified at the hearing.  (Tr. 392-403) Mr. Holderhead considered plaintiff's past work to include babysitting or child monitor, unit clerk, reservation clerk, and assistant nurse. (Tr. 393-394)  Mr. Holderhead was first asked to consider a hypothetical individual who could occasionally lift 50 pounds and could frequently lift 25 pounds; was able to stand and walk for six hours in an eight-hour workday; would have an unlimited ability to push and pull; could not climb ladders, ropes or scaffolds; would be limited to occasional bilateral overhead reaching; must avoid concentrated exposure to extreme cold and extreme heat; and must avoid concentrated exposure to wetness, humidity, fumes, odors, dusts, gases and poor ventilation. (Tr. 395)  Mr. Holderhead testified that this hypothetical individual would be able to perform Ms. Coleman's past work of child monitor, reservation clerk and unit clerk.  (Tr. 395)  He also testified that this individual would be able to perform the past work of assistant nurse, as it is described by the DOT, but not as Ms. Coleman had described it. (Tr. 395)

Mr. Holderhead was then asked to further assume that the hypothetical individual might be off task approximately 20 percent of the time due to issues with chronic pain and/or an affective disorder.  (Tr. 396)  Given this criteria, Mr. Holderhead did not believe the hypothetical person would be able to perform any of plaintiff's past work or that there would be any jobs available for such an individual.  (Tr. 396)

For the next hypothetical, Mr. Holderhead was asked to consider a person with the same age, education and past work as the claimant, who was able to occasionally lift 20 pounds and

13

frequently lift 10 pounds; was able to stand/walk and sit for six hours of an eight-hour workday;

was unlimited in her ability to push and pull other than stated for lifting and/or carrying; would

have limited ability to bilaterally reach overhead; could never climb ladders, ropes or scaffolds,

must avoid concentrated exposure to extreme cold and extreme heat; and must avoid

concentrated exposure to wetness and humidity, fumes, odors, dust, gases, and poor ventilation.

(Tr. 397)

    Mr. Holderhead opined that this hypothetical individual would be able to perform

plaintiff's past work of child monitor as she indicated she performed it but not as it is performed

in the national economy. (Tr. 397)  She could also perform the jobs of unit clerk and reservation

clerk. (Tr. 397-398) However, she would not be able to perform the job of nurse assistant. (Tr.

398) Mr. Holderhead further opined that this individual would be able to perform the job of

cashier II, with approximately 9,000 positions in Northeast Ohio, 30,000 in Ohio, and 900,000 in

the national economy. (Tr. 398)  This person could also work as a ticket seller, with

approximately 2,000 positions in Northeast Ohio, 9,000 in Ohio, and 75,000 in the national

economy.  (Tr. 398)  She could also be an office helper, with approximately 400 positions in

Northeast Ohio, 2,000 in Ohio, and 50,000 in the national economy. (Tr. 398-399)

    The ALJ then asked the VE to further assume that this hypothetical individual would be

off task approximately 20 percent of the time due to issues with chronic pain and/or symptoms

from an affective disorder. (Tr. 399)  Mr. Holderhead again opined that this additional limitation

would preclude the hypothetical individual from being able to perform any job.  (Tr. 399)

    For the last hypothetical, the ALJ asked Mr. Holderhead to consider a hypothetical

person with the same age, education and past work as Ms. Coleman who was able to

occasionally lift 10 pounds and frequently lift five pounds; was able to stand and walk two hours

of an eight-hour workday; was able to sit for six hours of an eight-hour workday; would be unlimited in her ability to push and pull other than what was already stated for lifting and/or carrying; would never be able to climb ladders, ropes, or scaffolds; would be limited to occasional bilateral overhead reaching; must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dust, gases and poor ventilation. (Tr. 399-400) Mr. Holderhead opined that this hypothetical individual would be able to perform plaintiff's past work of reservation clerk but would not be able to perform the other positions. (Tr. 400) The VE also opined that this individual would be able to work as an order clerk for a blood bank, with approximately 300 positions in Northeast Ohio, 1,600 in Ohio and 25,000 in the national economy. (Tr. 400-401) Such an individual could also work as a routing clerk with approximately 350 positions in Northeast Ohio, 1,500 in Ohio and 45,000 in the national economy. (Tr. 402) All three of those jobs involved transferable skills that the VE had previously identified from Ms. Coleman's past work. (Tr. 402) However, once again, Mr. Holderhead opined that the hypothetical individual would not be able to secure a job if she were going to be off-task 20 percent of the time due to chronic pain or an affective disorder. (Tr. 402-403)

## IV.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

15

experience, engage in any other kind of substantial gainful work which exists in the national economy[2]....

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[13] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

**V.    The ALJ's Decision**

The ALJ issued a decision on May 28, 2014.  A summary of her findings is as follows:

---

[2] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

1. Ms. Coleman met the insured status requirements of the Social Security Act through June 30. 2015.  (Tr. 353)

2. Ms. Coleman had not engaged in substantial gainful activity since December 3, 2011, the alleged onset date.  (Tr. 353)

3. Ms. Coleman had the following severe impairments: diabetes mellitus, asthma, hypertension, obesity, sciatica, degenerative disc disease (cervical), obstructive sleep apnea, and headaches.  (Tr. 353)

4. Ms. Coleman did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (Tr. 354)

5. Ms. Coleman had the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the ability to occasionally lift 20 pounds and frequently lift 10 pounds, with the ability to stand and walk 6 hours of an 8-hour workday; with the ability to sit for 6 hours of an 8-hour workday; with unlimited push and pull other than shown for lift and/or carry, but further limited to occasional bilateral overhead reaching; precluded from concentrated exposure to extreme cold and extreme heat; precluded from concentrated exposure to wetness and humidity; precluded from concentrated exposure to fumes, odors, dust, gases and poor ventilation; and preclude from climbing of ladders, ropes and scaffolds. (Tr. 357)

6. Ms. Coleman was unable to perform any past relevant work.  (Tr. 361)

7. She was born on July 10, 1963 and was 48 years old, which is defined as a younger individual age 18-49 on the alleged disability onset date. (Tr. 362) Ms. Coleman subsequently changed age category to closely approaching advanced age.

8. Ms. Coleman had at least a high school education and was able to communicate in English.  (Tr. 362)

9. Transferability of job skills was not material to the determination of disability because, using the Medical-Vocational Rules as a framework, supported a finding that the claimant was "not disabled," whether or not she had transferable job skills.  (Tr. 362)

10. Considering Ms. Coleman's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could perform.  (Tr. 362)

17

Based on the foregoing, the ALJ determined that Ms. Coleman had not been under a disability from December 3, 2011 through the date of the ALJ's decision.  (Tr. 363)

## VI.    Parties' Arguments

Plaintiff argues that the ALJ's determination that she had the residual functional capacity to perform light work was erroneous and based on an improper assessment by the ALJ of medical data rather than the opinions of medical experts. (Doc. 12)  Plaintiff also argues that the new evidence she has submitted warrants a remand under Sentence Six of 42 U.S.C. § 405(g).

Defendant argues that the ALJ's decision was supported by substantial evidence. (Doc. 14)  Defendant contends that the court should not remand this case under Sentence Six because the plaintiff has not demonstrated that the new evidence she has submitted is material or that she had good cause for failing to submit the evidence earlier.  The undersigned has considered the parties' arguments and recommends affirmance of the ALJ's decision for the reasons that follow.

## VII.    Law & Analysis

### A.    Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v.*

*Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."  *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997).  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do

not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

**B.    Residual Functional Capacity**

Residual functional capacity is defined as the most the claimant can still do despite the physical and mental limitations resulting from her impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a).  The ALJ determined that Ms. Coleman had severe impairments but that her claims regarding her limitations were "not entirely credible." (Tr. 358)  The ALJ determined that Ms. Coleman had the residual functional capacity to perform:

> Light work as defined in 20 CFR 404.1567(b) and 416.967(b), with the ability to occasionally lift 20 pounds and frequently lift 10 pounds; with the ability to stand and walk 6 hours of an 8-hour workday; with the ability to sit for 6 hours of an 8-hour workday; with unlimited push and pull other than shown for lift and/or carry, but further limited to occasional bilateral overhead reaching; precluded from concentrated exposure to wetness and humidity; precluded from concentrated exposure to fumes, odors, dusts, gases and poor ventilation; and precluded from climbing of ladders, ropes and scaffolds.

Plaintiff argues that the ALJ's determination of residual functional capacity was not supported by substantial evidence because there was no recent opinion from a medical expert supporting the ALJ's determination of plaintiff's residual functional capacity.  Plaintiff argues that the ALJ improperly evaluated the medical evidence without the assistance of an expert.  In support of her argument, plaintiff cites *Deskin v. Comm'r,* 605 F.Supp.2d 908 (N.D. Ohio 2008),

in which the district court reversed and remanded the decision of the ALJ because the ALJ's

decision was not properly supported by a medical opinion.  In *Deskin*, the court held:

> As a general rule, where the transcript contains only diagnostic evidence and no
> opinion from a medical source about functional limitations (or only an outdated
> nonexamining agency opinion), to fulfill the responsibility to develop a complete
> record, the ALJ must recontact the treating source, order a consultative
> examination, or have a medical expert testify at the hearing.  This responsibility
> can be satisfied without such opinion only in a limited number of cases where the
> medical evidence shows "relatively little physical impairment" and an ALJ "can
> render a commonsense judgment about the functional capacity."

*Id.* at 912.

However, in *Henderson v. Comm'r,* 2010 U.S. Dist. LEXIS 18644 (N.D. Ohio, March 1,

2010, Nugent, J.), this court declined to adopt the recommendation of the magistrate judge which

relied on *Deskin*. In his decision affirming a determination by an ALJ that a claimant was not

disabled, Judge Nugent stated,

> The Court finds, however, that *Deskin*, and therefore the portion of the
> [magistrate judge's] opinion that relies on *Deskin*, is not representative of the law
> established by the legislature, and interpreted by the Sixth Circuit Court of
> Appeals.  The statute and regulations setting forth the procedure and criteria for
> the ALJ's decision require the ALJ to determine whether there is a medically
> determinable impairment, to review objective evidence, review listed
> impairments, and then determine the issue of medical equivalence of the
> applicant's symptoms or condition.  20 C.F.R. § 416.920a(c)(1), Pt. 404, Subpt.
> P., App. 1, and 416.925(e).
>
> The ALJ, not a physician, is assigned the responsibility of determining a
> claimant's RFC based on the evidence as a whole.  42 U.S.C.A. § 423(d)(5)(B);
> 20 C.F.R. § 416.946(c).  Pursuant to the regulations, the ALJ is charged with
> evaluating several factors in determining the RFC, including the medical evidence
> (not limited to medical opinion testimony), and the claimant's testimony.  *Webb v.
> Comm'r of Soc. Sec.,* 368 F.3d 629, 633 (6th Cir. 2004); SSR 96-5p, 1996 SSR
> LEXIS 2, SSR 96-8p, 1996 SSR LEXIS 5.  The final responsibility for deciding
> the RFC "is reserved to the Commissioner."  20 C.F.R. § 416.927(e)(2).
>
> The Sixth Circuit has repeatedly upheld the ALJ decisions where the ALJ rejected
> medical opinion testimony and determined RFC based on objective medical
> evidence and non-medical evidence.  *See, e.g., Ford v. Comm'r of Soc. Sec.,* 114
> F.App'x 194 (6th Cir. 2004); *Poe v. Comm'r of Soc. Sec.,* 342 Fed. App'x. 149

21

2009 WL 2514058, at *7 (6th Cir. 2009). "[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe,* 342 Fed. Appx. 149, 2009 WL 2514058 at *7. Although the ALJ discounted the testimony of the doctors who proposed widely varying ranges of limitations and abilities, he was within a clearly appropriate "zone of choice" to find that the testimony (even if not all fully credible) suggested some limitation was appropriate. *See, Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir. 2001).

In the Sixth Circuit, it is well established that the claimant—and not the ALJ—has the burden to produce evidence in support of a disability claim. See, e.g., *Wilson v. Comm'r of Soc. Sec.,* 280 Fed. App'x. 456, 459 (6th Cir. 2008) (citing 20 C.F.R. § 404.1512(a)). See also *Struthers v. Comm'r of Soc. Sec.,* 1999 U.S. App. LEXIS 11102, 1999 WL 357818 at *2 (6th Cir. May 26, 1999) ("[I]t is the duty of the claimant, rather than the administrative law judge, to develop the record to the extent of providing evidence of mental impairment."); *Landsaw v. Sec'y. of Health & Human Servs.,* 803 F.2d 211, 214 (6th Cir. 1986) ("The burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant. 20 C.F.R. §§ 416.912, 416.913(d)."); cf. *Wright—Hines v. Comm'r of Soc. Sec.,* 597 F.3d 392, 396 (6th Cir. 2010). However, there is a special, heightened duty requiring the ALJ to develop the record when the plaintiff is "(1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures." *Wilson*, 280 Fed. App'x. at 459 (citing *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051-52 (6th Cir. 1983)).

In the case at bar, it is undisputed that Ms. Coleman has always been represented by counsel. (See e.g. Tr. 369) Thus, the ALJ had no heightened duty to develop the record and "the ultimate burden of proving disability" remained with Ms. Coleman. *See Wilson*, 280 Fed. Appx. at 459 [citing *Trandafir v. Comm'r of Soc. Sec.,* 58 Fed. Appx. 113, 115 (6th Cir. Jan. 31, 2003)]. *See also Meadows v. Astrue,* 2012 U.S. Dist. LEXIS 151346, 2012 WL 5205798 at * 4 (N.D.

Ohio Sept. 25, 2012); *Guy v. Astrue,* 2010 U.S. Dist. LEXIS 27041, 2010 WL 1141526 at * 10-11 (M.D. Tenn. March 4, 2010).  Therefore, to the extent the record was incomplete, such deficiency is imputed to Ms. Coleman and fails to provide justification for a remand.  "The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician." *See* 20 C.F.R. §§ 404.1546(c), 416.946(c).  Although the ALJ may not substitute her opinion for that of a physician, she is not required to recite the medical opinion of a physician verbatim in her residual functional capacity finding.  *See* 20 C.F.R. §§ 404.1545(a), 416.945(a)(3).  Moreover, an ALJ does not improperly assume the rule of medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding.  *See Ford v. Comm'r of Soc. Sec.,* 114 F.App'x 194, 197 (6th Cir. 2004).

The undersigned finds that the ALJ's determination of Ms. Coleman's residual functional capacity was substantially supported by the medical and non-medical evidence before her.  The ALJ considered the medical opinion of the stage agency reviewer, Dr. Klyop, but only assigned "some weight" to his opinion.  In fact, when assessing Ms. Coleman's residual functional capacity, the ALJ found that Ms. Coleman's limitations were greater than those assessed by Dr. Klyop after the ALJ considered all of the evidence. (Tr. 360)  As stated above, it was plaintiff, not the ALJ, who bore the burden of seeking an updated medical opinion, if such an opinion was necessary.  The ALJ was not required to do so before assessing the evidence before her and rendering a finding as to Ms. Coleman's residual functional capacity. *See Poe v. Commissioner of Social Security,* 342 Fed. App'x, 149, 157 (6th Cir. 2009) (citing *Ford v. Comm'r of Soc. Sec.,* 114 F.App'x 194, 197 (6th Cir. 2004).  For these reasons, the undersigned recommends that the ALJ's decision as to Ms. Coleman's residual functional capacity be affirmed.

### C.     New Evidence

Plaintiff also submitted new evidence after the May 2014 hearing and has requested a "Sentence Six" remand for further administrative proceedings pursuant to Sentence 6 of 42 U.S.C. § 405(g).  When a plaintiff presents new evidence, a remand is appropriate only if the claimant (1) shows that the new evidence is material, and (2) that there is good cause "for failure to incorporate such evidence into the record in a prior proceeding." *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.,* 447 F.3d 477, 483 (6th Cir. 1992).

Plaintiff's request for a Sentence Six remand is focused on the medical source statement provided by Dr. Morton after the hearing. (Tr. 16-17)  Plaintiff argues that Dr. Morton's statement is "new evidence" because it did not exist at the time of the hearing and is relevant because it relates to plaintiff's condition and functioning prior to the hearing decision. She also argues that it is material because there is a reasonable probability that the Commissioner would have reached a different decision if this new evidence had been available at the time of the administrative hearing.

New evidence is "material" if it "would likely change the Commissioner's decision." *Bass v. McMahon,* 499 F.3d 506, 509 (6th Cir. 2007) [quoting *Sizemore v. Sec'y of Health & Human Servs.,* 865 F.2d 709, 711 (6th Cir. 1988)].  The undersigned has reviewed the medical source statement submitted by Dr. Morton and finds it unlikely that the ALJ's consideration of this material would have changed her decision.

First, as argued by the Commissioner, it is unlikely that Dr. Morton would have been considered a treating physician.  Under the regulations, a treating physician is defined as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you with medical treatment or evaluation and *who has, or has had, an ongoing*

*treatment relationship with you.*" 20 C.F.R. § 404.1502 (emphasis added). In *Kornecky v. Comm'r of Soc. Sec.,* 167 F.App'x 496, 506, the Sixth Circuit Court of Appeals held that "the relevant inquiry is not whether [the physician] might have become a treating physician in the future if [the claimant] had visited him again.  The question is whether [the physician] had the ongoing relationship with [the claimant] to qualify as a treating physician at the time he rendered his opinion."

Plaintiff has not pointed to any examination by Dr. Morton until January 2014, two months before her administrative hearing took place.  It appears that Dr. Morton only met with her once before the hearing took place.  Dr. Morton met with plaintiff a second time in April 2014 shortly after the hearing took place. The ALJ issued her decision regarding plaintiff's residual functional capacity as of May 28, 2014.  When the decision was issued, it does not appear that Dr. Morton had had an ongoing relationship with plaintiff and could have been considered a treating physician.  While Dr. Morton could later have been recognized as a treating physician, he most likely would not have been considered one at the time the ALJ issued her decision.  Thus, it is unlikely that his opinion would have changed the commissioner's decision.

Secondly, even if Dr. Morton could have been considered a treating source and even supposing his opinion was relevant to the time period adjudicated by the ALJ, it is unlikely that his opinion would have changed the ALJ's decision.  Dr. Morton described plaintiff's pain as mild to moderate. (Tr. 17)  He opined that plaintiff could stand/walk and sit for 4-6 hours in an 8 hour workday.  (Tr. 16)  None of the jobs that the ALJ determined plaintiff could perform required crawling or more than occasional postural activities and, therefore, did not contradict that portion of Dr. Morton's statement. (Tr. 16)  Dr. Morton opined that plaintiff could engage in frequent fine and gross manipulation, the highest category provided on the form he completed.

25

(Tr. 17)   Although he indicated that plaintiff would require an additional unscheduled rest period of 8 hours, he provided no explanation as to the meaning or support for this ambiguous statement. (Tr. 17)  For example, this opinion could have been interpreted to mean that a normal 8 hour rest period when not working would satisfy the resting requirement for plaintiff.  It is illogical to conclude that the statement meant that plaintiff would have needed eight hours of rest in an eight hour work day.  Dr. Morton also indicated that plaintiff would need to elevate her legs 45 degrees.  (Tr. 17) However, he did not provide any explanation or support for this opinion and this lack of explanation would have been a factor considered by the ALJ.  (Tr. 17)  Thus, it is unlikely that the medical source statement completed by Dr. Morton would have changed the ALJ's decision.

The other new evidence cited in support of plaintiff's request for a Sentence Six remand is Dr. Morton's office note from November 6, 2014, five months after the ALJ issued her decision.  (Tr. 204)  Plaintiff points out that this office note reports that plaintiff was having continued weakness in her upper extremities and that she was having difficulty opening jars and holding objects for a long time. (Tr. 204)  To the extent that this office note relates to plaintiff's condition after May 28, 2014, it is immaterial to the time period adjudicated by the ALJ. "Evidence which reflected the applicant's aggravated or deteriorated condition is not relevant because such evidence does not demonstrate the point in time that the disability itself began. Reviewing courts have declined to remand disability claims for reevaluation in light of medical evidence of a deteriorated condition." *Sizemore,* 865 F.2d at 712 [citing *Oliver v. Secretary of Health & Human Serv.,* 804 F.2d 964, 966 (6th Cir. 1986)]  If, in fact, the claimant's condition had seriously degenerated, the appropriate remedy would have been to initiate a new claim for

26

benefits as of the date that the condition aggravated to the point of constituting a disabling impairment. *Id.*; *Oliver,* 804 F.2d at 966.

Moreover, even if Dr. Morton's November 6, 2014 office notes were not related to plaintiff's aggravated condition after the ALJ issued her decision, the office notes reflect plaintiff's own subjective statements regarding her condition.  (Tr. 204)  They do not show objective medical evidence that would have been likely to change the commissioner's decision.

Finally, plaintiff has not shown good cause for failing to incorporate the evidence into the record.  A claimant shows "good cause" by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion at the hearing before the ALJ.  *Willis v. Sec'y of Health & Human Servs.,* 727 F.2d 551, 554 (1984) (per curiam). The burden of showing that a remand is appropriate is on the claimant. *Oliver,* 804 F.2d at 966.  Plaintiff states that she has shown good cause because Dr. Morton's medical source statement and his subsequent office notes did not exist at the time the ALJ's decision was issued.  However, plaintiff was represented at the hearing by counsel who requested only that the record remain open long enough to permit plaintiff to submit medical records related to medical services that had already been provided to plaintiff. (Tr. 372)  Consequently, plaintiff has failed to establish that there was good cause for her failure to obtain the additional records and present them as evidence.  *Willis*, 727 F.2d at 554. The undersigned finds that plaintiff has failed to show that the new evidence submitted with her appeal is material or that she had good cause for failing to present it as evidence before the ALJ. For this reason, the undersigned recommends that the court deny plaintiff's request for a Sentence Six remand.

## VIII.   Conclusion

In summary, the court should find that the ALJ's decision is supported by substantial evidence in the record.  The ALJ's finding of residual functional capacity was substantially supported by the medical and non-medical evidence submitted.  If plaintiff wanted the ALJ to consider an updated medical opinion prior to issuing her decision, it was plaintiff, not the ALJ, who carried the burden of presenting such evidence.  The plaintiff has also failed to establish that the court should grant a Sentence Six remand because she has failed to show that the new evidence submitted with this appeal is material or that she had good cause for failing to submit it to the ALJ.  For these reasons, I recommend that the final decision of the Commissioner be AFFIRMED, pursuant to 42 U.S.C. § 405(g).

Dated: November 29, 2016

Thomas M. Parker
United States Magistrate Judge

_____

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**